CITY OF DAYTON *v.* SCHENCK.

(No. 79 TRC 787—Decided February 11, 1980.)

Dayton Municipal Court.

*Mr. Mark Friedman,* for the City of Dayton.
*Mr. John Ensley,* for defendant.

MERZ, J. This matter is before the court upon defendant's Motion to Suppress the results of an Intoxilyzer test administered in this case. The motion was submitted on briefs and oral testimony, presented February 5, 1980. Defendant asserted three grounds, the third of which, "other procedural error," was abandoned upon hearing.

With respect to the second ground, that the Intoxilyzer does not provide a test "by weight," defendant introduced a number of arguments by his expert witness, Walter Frajola, that the results produced by the Intoxilyzer are or may be inaccurate measures of the percentage of blood alcohol by weight. These arguments are all familiar. They attack the underlying scientific assumptions which must be embodied in any machine which measures one variable, alcoholic content of expelled air, and converts it to another reading, blood alcohol content. However, defendant's expert's testimony is not sufficient to

overcome the determination made by the state that the Intoxilyzer is reliable. Defendant failed to distinguish the Intoxilyzer's reliance on certain underlying scientific assumptions or conclusions from the necessary reliance upon some such assumptions which must be made in constructing any machine which converts any one variable directly to another. The defendant failed to show that the state's approval of the Intoxilyzer as a reliable instrument for testing for the alcoholic content of the blood is so totally lacking in factual foundation as to be an abuse of discretion by the director of health, under R. C. 4511.19.

Defendant's other argument is that the Intoxilyzer test is not a "chemical" test as required by R. C. 4511.19, but is rather a "physical" test. Defendant thus presents an important question of statutory interpretation.

The statute nowhere delineates what constitutes a chemical test. In his motion papers, defendant also did not outline what he felt would qualify as a chemical test. However, upon oral hearing, defendant made his own interpretation of the statute clear. Defendant says that a mixture of unknown composition is "chemically" tested for the presence of a particular compound if, but only if, the test involves exposing the mixture to a known chemical reagent and observing whether a chemical reaction occurs which is known scientifically to occur only in the presence of the compound sought to be identified. Perhaps the classic "chemical" test by this definition is the test of a liquid for acidity or alkilinity by insertion of litmus paper which turns color to indicate the result.

Defendant is quite correct in asserting that the Intoxilyzer does not involve a "chemical" test of this sort. A "chemical reaction" has been defined as the "process by which one or more substances may be transformed into one or more new substances." The New Columbia Encyclopedia (1975 Ed.). No such chemical reaction takes place in the Intoxilyzer process. Rather, it is based upon the principle that alcohol will absorb infrared light of a wavelength of 3.39 microns in a more intense way than other chemical compounds. None of the alcohol in the tested breath sample reacts with any other chemical. Rather, infrared light of known intensity is introduced into the sample and the amount of light actually emerging is measured. By "knowing" how much of such light will be absorbed by a given quantity of alcohol, the machine computes the amount of

alcohol in the breath and converts it by a constant factor (2100:1) into a blood alcohol figure.

In this court's opinion, however, defendant's definition of chemical test is far too narrow. The statute permits the court to admit evidence of blood alcohol level as shown by "chemical analysis of the defendant's blood, urine, breath, or other bodily substance***." The New Columbia Encyclopedia defines "chemical analysis" as "the corpus of all techniques whereby any exact chemical information is obtained." The same source specifically mentions that physical techniques such as the mass spectrometer are used for the same purpose. Defendant's own expert testified that a number of physical (in the sense of involving no chemical reactions) techniques such as the gas chromatograph and the infrared and ultraviolet spectrophotometers are routinely used by chemists to test for the presence and quantity of certain compounds. Indeed for certain purposes these techniques of chemical analysis may be preferred by chemists over chemical reaction types of tests. Thus, defendant's expert criticized the Intoxilyzer (which employs a very narrow band of infrared) by comparing it with the much more certain (in his opinion) test which would be provided by full-band infrared spectroscopy.

In sum, the phrase "chemical analysis" is used quite commonly to include tests for identifying chemical compounds by their physical properties, as the Intoxilyzer does.

Dictionary definitions are not statutes which determine as a matter of law what meanings words must have. Rather, dictionaries record common usage. In statutory interpretation, dictionaries are appropriately referred to to determine what the legislature probably meant. But the touchstone of statutory interpretation is the legislature's purpose, not any supposed "plain meaning" of the words it used. (See Merz, The Meaninglessness of the Plain Meaning Rule, 4 U. Dayton L. Rev. 31.)

In that light, it is hardly conceivable that the legislature intended under R. C. 4511.19 to allow into evidence the results of chemical analyses which employ chemical reactions but to exclude non-reaction physical tests regarded as equally reliable by persons who do chemical analyses professionally every day.

*Motion to suppress overruled.*